10-3045-pr
Langston v. Smith

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: October 18, 2010                    Decided: January 7, 2010)

Docket No. 10-3045-pr

_____

KEVIN LANGSTON,

*Petitioner-Appellee*,

—v.—

JOSEPH SMITH, Superintendent of Shawangunk Correctional Facility,

*Respondent-Appellant*.

_____

Before:
FEINBERG, NEWMAN, and LYNCH, *Circuit Judges*.

_____

Petitioner-appellee Kevin Langston sought habeas relief in the United States District Court for the Eastern District of New York following the state appellate court's affirmance of his conviction for felony assault and second-degree criminal possession of a weapon. The district court (Edward R. Korman, *J.*) held that the evidence presented at trial was insufficient to sustain Langston's felony assault conviction and granted partial relief.

Respondent-appellant Joseph Smith, the Superintendent of Shawangunk Correctional Facility, appealed.  We find that no reasonable jury could have convicted Langston of felony assault, and that the state appellate court unreasonably applied Jackson v. Virginia, 443 U.S. 307 (1979), in concluding otherwise.

We therefore AFFIRM the district court's grant of the writ.

_____

WARREN S. LANDAU (Lynn W. L. Fahey, *on the brief*), Appellate Advocates, New York, New York, *for Petitioner-Appellee*.

MORGAN J. DENNEHY, Assistant District Attorney (Leonard Joblove, Ann Bordley, and Victor Barall, Assistant District Attorneys of Counsel, *on the brief*), *for* Charles J. Hynes, District Attorney, Kings County, Brooklyn, New York, *for Respondent-Appellant*.

_____

GERARD E. LYNCH, *Circuit Judge*:

In 2003, a New York jury convicted petitioner-appellee Kevin Langston of felony assault and criminal possession of a weapon in the second degree.[1]  New York's felony assault statute criminalizes actions taken "[i]n the course of and in furtherance of the commission . . . of a felony" that cause "serious physical injury" to a non-participant.  N.Y. Penal Law § 120.10(4).  At trial, the prosecution demonstrated that one of Langston's

_____

[1] "A person is guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another, [he] possesses a loaded firearm." N.Y. Penal Law § 265.03(1)(b).

accomplices shot and seriously injured NYPD Detective Arthur Marquez during what appears to have been an attempted robbery. Langston was not charged with committing the assault in furtherance of the felony of attempted robbery. Instead, the jury was instructed that to convict Langston of felony assault, it had to find that Langston committed the assault "in the course of and in furtherance of" the felony of criminal possession of a weapon, a finding the jury implicitly made by finding Langston guilty of felony assault.

Langston, after unsuccessfully challenging the sufficiency of the evidence against him on direct appeal, see People v. Langston, 806 N.Y.S.2d 886 (2d Dep't), leave to appeal denied, 816 N.Y.S.2d 755 (2006), sought habeas relief in the Eastern District of New York (Edward R. Korman, *J.*). Judge Korman granted Langston's petition after determining that the evidence at trial was constitutionally insufficient to prove the "in furtherance of" element beyond a reasonable doubt. Langston v. Smith, No. 07-cv-2630, 2010 WL 3119284, at *7 (E.D.N.Y. Aug. 6, 2010). Respondent-appellant Joseph Smith, the Superintendent of Shawangunk Correctional Facility ("the State"), appealed.

## BACKGROUND[2]

On May 8, 2002, a confidential informant introduced John Robert, an undercover officer in the NYPD's Firearms Investigation Unit, to local gun dealer Edward Moultrie.

---

[2] Because we are conducting constitutional sufficiency review, we present "the evidence in the light most favorable to the prosecution." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

3

Following that meeting, Moultrie agreed to facilitate Robert's purchase of four 9mm handguns. A few days later, Robert and Marquez (together, "the officers") met Moultrie and "his man" Langston at Junior's Restaurant in Brooklyn, New York to carry out the deal.

When the officers arrived at Junior's, Langston insisted that the sale take place at a high-rise housing project a few miles away and directed them to 301 Sutter Avenue, the building in which he grew up. Once there, Moultrie, Robert, and Marquez waited outside while Langston entered the building, purportedly to initiate contact with the sellers. Langston testified that he looked for, but was unable to find, his friend E-Town, who had previously agreed to sell Robert and Marquez the weapons and to compensate Langston for his efforts. Langston did, however, make contact with Gamel Cherry, an acquaintance who lived in the building.[3] Langston testified that Cherry agreed to provide the weapons necessary to complete the sale.

After making arrangements with Cherry, Langston returned outside, informed Robert and Marquez that the sellers needed the money up-front, and offered to act as courier for the transaction. Robert rejected this proposal, but agreed to "do the deal" inside the building. Robert, Marquez, and Moultrie then followed Langston into 301

[3] The jury need not have credited Langston's testimony that the arrangement with Cherry was impromptu, and was entitled to infer that Langston and Cherry had been working together from the start, as Langston implied to the undercover "purchasers."

4

Sutter Avenue where Langston greeted a few people, including Ralph Wyman, who were milling about the lobby. After Robert again refused to prepay, Langston convinced the officers to make their purchase in the sixth floor hallway. On their way up, the elevator stopped on the fifth floor, where Skyler Brownlee was waiting. When the elevator door opened, Brownlee acknowledged Langston, but did not get on the elevator.

On the sixth floor, Langston and Robert continued to argue about the mechanics of the deal. At one point, Cherry entered the hallway from the stairwell and joined in Langston's unsuccessful efforts to secure prepayment. Cherry demanded that the officers produce identification. After Marquez complied, Cherry, apparently satisfied, told Robert and Marquez that they were "going to get what [they] came . . . for" and left the hallway.

While awaiting Cherry's return, Langston tried to convince Robert to reimburse him for cab fare from Manhattan to Brooklyn. Suddenly, Cherry, Brownlee, and Wyman burst into the hallway with guns drawn and opened fire on the officers.[4] A bullet from the initial volley of shots struck Marquez's hand, causing permanent damage. Robert and Marquez returned fire before retreating into the stairwell to escape their assailants. Langston, who had been standing next to Robert at the time of the shooting, also fled the scene. Police officers found him inside a nearby train station bleeding from gunshot wounds to his arm and buttocks.

---

[4] At trial, the government alleged that a fourth individual, Leonard Barber, also participated in this assault. Barber was tried separately and acquitted of all charges.

Back-up officers responding to the scene discovered Moultrie lying partially paralyzed on the hallway floor with wounds to his back and face. Crime scene investigators recovered a 9mm handgun, twenty-seven discharged 9mm shells (all of which came from the officers' weapons), and ballistics evidence from a .22 caliber pistol, including one discharged shell, one live cartridge, and numerous bullet fragments.

A grand jury indicted Langston on thirteen counts ranging from attempted murder to attempted criminal sale of a firearm. People v. Langston, Ind. No. 3508 (N.Y. Sup. Ct. Kings Co. 2002). At trial, Langston testified in his own defense. He insisted that he barely knew Cherry and had never met Wyman or Brownlee. While Langston admitted to attempting to arrange a gun sale, he vehemently denied any involvement in plotting a robbery or any knowledge that Cherry, Wyman, or Brownlee possessed weapons other than those offered for sale.

Five counts went to the jury: felony assault, second-degree criminal possession of a .22 caliber handgun, third-degree criminal possession of a .22 caliber handgun, second-degree criminal possession of a 9mm handgun, and third-degree criminal possession of a 9mm handgun. The jury acquitted Langston of the possession charges related to the 9mm handgun, but convicted him of felony assault and second-degree possession of the .22 caliber weapon. As instructed by the trial judge, reaching this verdict required the jury to find, beyond a reasonable doubt, that the assault on Marquez was committed in

furtherance of the felony weapon possession.

The trial court sentenced Langston to twenty-five years' imprisonment on the felony assault count and to a concurrent five-year sentence on the possession count. Brownlee, Wyman, and Moultrie all pleaded guilty to criminal possession of a weapon in the second degree. Brownlee and Wyman were sentenced to ten years' imprisonment, while Moultrie received a twelve-month sentence. Cherry was tried with Langston, convicted of felony assault, and sentenced to twenty-five years.

On direct appeal, Langston primarily argued that the evidence presented at trial was insufficient to prove that he acted in concert with Cherry, Wyman, and Brownlee. Langston also insisted that, while he intended to sell weapons, he did not anticipate that the transaction would degenerate into a shootout and, therefore, he should not be held liable for Marquez's injuries. Langston also argued that the State failed to prove beyond a reasonable doubt that the assault was committed in furtherance of the weapon possession. The Appellate Division of the New York Supreme Court rejected Langston's claims and affirmed his conviction. People v. Langston, 806 N.Y.S.2d at 886-87, leave to appeal denied, 816 N.Y.S.2d at 755.

After exhausting his state-law remedies, Langston filed a timely petition in the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court concluded that the evidence was insufficient to prove the "in furtherance of" element of

felony assault beyond a reasonable doubt and granted Langston's petition. Langston v. Smith, 2010 WL 3119284, at *7. However, the district court denied the petition with respect to Langston's conviction for second-degree weapon possession and rejected Langston's claim that the prosecution failed to prove that he acted in concert with Cherry, Brownlee, and Wyman. Id. at *4. Langston does not appeal this portion of the district court's ruling, perhaps because he has now been incarcerated for more than eight years, three years longer than his sentence on the possession charge.[5]

**DISCUSSION**

I. Standard of Review

We review the district court's grant of Langston's habeas petition de novo. Jones v. Keane, 329 F.3d 290, 294 (2d Cir. 2003). Our review focuses on the state appellate court's decision upholding Langston's conviction. Since that court rejected Langston's insufficiency claim on the merits, we must determine whether its ruling was erroneous, and, if so, whether the error resulted from an "unreasonable application" of the

---

[5] A different district court judge denied habeas relief to Cherry, who made arguments similar to Langston's. See Cherry v. Walsh, No. 09-CV-1452, 2009 WL 2611225 (E.D.N.Y. Aug. 25, 2009). Unlike Langston, however, Cherry did not preserve his sufficiency claim, and therefore he was procedurally barred from raising it on habeas appeal. Id. at *9-10. That district court, in dicta, also addressed the merits of Cherry's claim and rejected his insufficiency argument. Id. at *11-12. We find the district court's analysis in Cherry, which cited no caselaw to support its interpretation of the "in furtherance of" element, unpersuasive, and for the reasons set forth below agree with Judge Korman's contrary analysis in the instant case.

8

sufficiency of the evidence standard laid out by the Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979). See 28 U.S.C. § 2254(d)(1).[6]

II. The Merits

A. Due Process Requirements

Langston argues that his conviction violated the Due Process Clause of the Fourteenth Amendment, which forbids conviction "'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" Jackson, 443 U.S. at 315, quoting In re Winship, 397 U.S. 358, 364 (1970). This requirement "provides concrete substance for the presumption of innocence – that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" Winship, 397 U.S. at 363, quoting Coffin v. United States, 156 U.S. 432, 453 (1895).

Despite the importance of this constitutional principle, judges must be highly deferential to the jury's verdict of conviction: courts "view[] the evidence in the light most favorable to the prosecution," Jackson, 443 U.S. at 319, and will uphold the jury's

---

[6] Langston's argument that the State waived its entitlement to section 2254(d) deference is unpersuasive. Even if we assume that this standard of review is waivable, the State's ambiguous statements to the district court, when reviewed in context and in conjunction with its pre- and post-hearing submissions, cannot reasonably be construed as a waiver. Cf. 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").

verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury [could convict]," United States v. MacPherson, 424 F.3d 183, 187 (2d Cir. 2005) (internal quotation marks omitted). That said, "a conviction based on speculation and surmise alone cannot stand," United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994), and courts cannot "credit inferences within the realm of possibility when those inferences are unreasonable," United States v. Quattrone, 441 F.3d 153, 169 (2d Cir. 2006).

This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16; Henry v. Ricks, 578 F.3d 134, 138 (2d Cir. 2009). "[W]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible. . . . [T]he inferences [must be] sufficiently supported to permit a rational juror to find that the element . . . is established beyond a reasonable doubt." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995).

B. The Elements of New York Penal Law § 120.10(4)

New York's felony assault statute characterizes as first-degree assault actions causing serious physical injury that occur "in the course of and in furtherance of the commission . . . of a felony." N.Y. Penal Law § 120.10(4). In so doing, it replaces the intent to injure requirement traditionally associated with the crime of assault with the

10

intent to commit the underlying felony (here, criminal possession of a .22 caliber handgun). See People v. Snow, 530 N.Y.S.2d 913, 915 (4th Dep't 1988), aff'd, 543 N.Y.S.2d 385 (1989). In this respect, felony assault is closely akin to the common-law and statutory crime of felony murder, which punishes killings as murder, even in the absence of intent to kill, when death is caused in furtherance of a felony.[7]

The trial judge instructed the jury that in order to convict Langston of felony assault it had to find four elements beyond a reasonable doubt: (1) Langston either committed or aided and abetted "the crime of criminal possession of a weapon," (2) Marquez suffered a "serious physical injury," (3) Langston or another participant caused Marquez's injury "while in the course of and in furtherance of the commission of criminal possession of a weapon," and (4) "Marquez was not a participant in the crime." (Tr. 1124-26.) Langston argues that the evidence at trial failed to establish that Marquez's injury was caused in furtherance of the weapon possession.

Although the precise boundaries of the "in furtherance of" requirement remain uncharted, the New York courts have provided sufficient guidance for us to resolve Langston's petition. Under New York law, "meaning and effect should be given to all [of

---

[7] See, e.g., N.Y. Penal Law § 125.25(3) ("Acting either alone or with one or more other persons, he commits or attempts to commit [one of ten enumerated violent felonies] and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants.").

11

a statute's] language, if possible, and words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning." N.Y. Stat. Law § 231. Therefore, "in the course of" and "in furtherance of" "must be construed as two distinct proof elements, each of which has independent meaning." People v. Afzal, No. 3736-07, 2009 N.Y. Slip Op. 51291(U), at *7 (Sup. Ct. N.Y. Co. June 23, 2009). In other words, the assault "must have a nexus" with the underlying felony beyond the fact that they occurred at the same time. Id.

As the New York Court of Appeals has repeatedly said, to be guilty of felony assault, the defendant must injure the victim "in the attempted execution of the unlawful end." People v. Joyner, 308 N.Y.S.2d 840, 842 (1970) (internal quotation marks omitted);[8] see also People v. Cahill, 777 N.Y.S.2d 332, 386 (2003) (Graffeo, J., concurring in part and dissenting in part) (explaining that in 1965 the legislature adopted the "in the attempted execution of" language as part of the "in furtherance of" requirement), quoting People v. Wood, 201 N.Y.S.2d 328, 332 (1960); People v. Ryan, 263 N.Y. 298, 303 (1934). "[T]he act which results in [injury] must be in furtherance of the unlawful purpose." Cahill, 777 N.Y.S.2d at 336 (Graffeo, J., concurring in part and

_____

[8] New York's felony murder statute, like its felony assault statute, uses the "in furtherance of" language. See N.Y. Penal Law § 125.25(3). As a result, New York's felony murder jurisprudence provides useful guidance in interpreting the felony assault statute. See People v. Spivey, 599 N.Y.S.2d 477, 479-80 (1993) (applying felony murder jurisprudence to felony assault prosecution); People v. Snow, 530 N.Y.S.2d 913, 915 (4th Dep't 1988) (same).

dissenting in part) (internal quotation marks omitted); see also People v. Taylor, 738 N.Y.S.2d 497, 506 (Sup. Ct. Queens Co. 2002).

People v. Swansbrough provides an example. In that case, a jury convicted Tonya Swansbrough of, among other things, felony assault and unlawful imprisonment for her role in an attack on an unarmed woman. 802 N.Y.S.2d 777, 778 (3d Dep't 2005). A male co-defendant had facilitated the assault by restraining the victim during the beating and the jury concluded that the assault was committed in furtherance of that unlawful imprisonment. Id. The state appellate court reversed Swansbrough's felony assault conviction, holding "that the evidence . . . was insufficient to support the conclusion that the assault was committed to further the unlawful imprisonment . . . [R]ather, any unlawful imprisonment was committed in furtherance of the assault." Id. at 779. In effect, the court found that the assault was not committed "in the attempted execution of" the unlawful imprisonment, even though the assault likely aided the unlawful imprisonment and the two crimes occurred at the same time.[9]

As Swansbrough implies, the efficacy of the action taken in furtherance of the underlying felony is irrelevant; the law is only concerned with whether the action was

---

[9] While Swansbrough held, in the alternative, that "because [the trial court] should have dismissed the unlawful imprisonment count under the merger doctrine, there was no underlying felony to serve as the basis for a felony assault," it did so only after first concluding that any unlawful imprisonment was not committed in furtherance of the assault. 802 N.Y.S.2d at 778-79.

13

committed with such a design. For example, in People v. Slaughter the New York Court of Appeals upheld a felony murder conviction after an imprudently-driven get-away car crashed into another vehicle, killing its occupant, despite the fact that the reckless driving that caused the victim's death did not, as it turned out, facilitate the defendant's crime, but actually thwarted his escape and led to his apprehension. 577 N.Y.S.2d 206, 209-10 (1991).

## C. Sufficiency of the Evidence

The prosecutor tried this case as a botched robbery. He began his opening statement by arguing that "Langston and the men he was working with never had any intentions of selling any guns. Instead, they planned a robbery. And when that didn't work they shot [Marquez] and then tried to shoot [Robert]." (Tr. 461.) The prosecutor then reenforced this argument during summation, asserting that "[Langston's] plan was to lure two people . . . into Brooklyn . . . have them outnumbered, have them outarmed and then take what they have got." (Tr. 1091.)

There is no question that the evidence presented at trial supported the prosecution's robbery theory. Had the jury convicted Langston after being asked to decide whether the assault on Marquez had been committed in furtherance of an attempted robbery, affirmance of that verdict would present no difficulty. However, Langston was not charged with attempted robbery, and the trial judge instructed the jury

14

that to convict Langston of felony assault it had to find, beyond a reasonable doubt, that "[he] or another participant caused . . . serious physical injury to Arthur Marquez while in the course of and in furtherance of criminal possession of a weapon." (Tr. 1125.) Under New York law, that instruction's reference only to the criminal possession charge eliminated all other possible theories of conviction. See People v. Bell, 48 N.Y.2d 913, 915 (1979); People v. Suggs, 745 N.Y.S.2d 706, 706 (2d Dep't 2002); People v. Wilson, 624 N.Y.S.2d 718, 719 (4th Dep't 1995).

In contrast to the prosecution's repeated focus on the alleged attempted robbery, the requirement in the jury charge that the assault be committed in furtherance of weapon possession was wholly ignored. The prosecution's sole mention of the necessary relationship between Marquez's injuries and the underlying possession charge occurred in a single sentence during summation:

> The part that I want you to cue in on and the part that I want to talk to you about is that Artie Marquez suffered these injuries *while* Kevin Langston, along with the other young men in this case, jointly, together possessed guns that were loaded and that worked.

(Tr. 1100) (emphasis added). Even here, the prosecutor spoke only of the required *temporal* relationship between the assault and the weapon possession; he altogether ignored the "in furtherance of" requirement.

In keeping with this confused approach, the prosecutor presented no evidence tending to show that the officers were assaulted "to further," Swansbrough, 802 N.Y.S.2d

15

at 779, the possession of the very guns used in the attack – the theory on which the State principally defends the conviction in this Court. To the contrary, based on the evidence that he did present, the prosecutor concluded that "there [was] a very specific reason why these guns were pulled and used" and that was to "wrest . . . money from [Robert and Marquez]." (Tr. 1098.) As the prosecutor seemingly admitted, shooting Marquez was in no way part of a plan to ensure that the guns used in the assault remained in the shooters' possession; rather, the guns were used specifically in an attempt to rob.

The facts of this case are remarkably similar to those in Swansbrough. There, the unlawful imprisonment was committed for the purpose of facilitating the assault, rather than the assault being committed to further the unlawful imprisonment, 802 N.Y.S.2d at 779; here, Cherry, Brownlee, and Wyman possessed weapons for the "very specific reason" of assaulting and robbing Robert and Marquez – they did not assault the officers in order to retain their own weapons. (Tr. 1098.) The evidence in Swansbrough could not support the conclusion that the assault was committed "to further" the unlawful imprisonment, 802 N.Y.S.2d at 779, even though the assault likely aided efforts to restrain the victim. Here, even though shooting Marquez and Robert may have made it less likely that Langston and his accomplices would lose their guns, the evidence against Langston failed to demonstrate that the assault was committed to further the weapon possession. As the district court held:

16

The District Attorney argues that the purpose of the assault was to further the goal of criminally possessing the guns – in other words, Langston's accomplices appeared and opened fire in order to prevent the detectives from taking the weapons with which they were committing the assault. Such a scenario strains the bounds of imagination and simply could not be inferred from the evidence presented at trial. Indeed, the District Attorney's argument gets it exactly backwards – the criminal possession was committed in furtherance of the assault and attempted robbery, the assault was not committed in furtherance of the criminal possession of the weapons.

Langston v. Smith, 2010 WL 3119284, at *7 (internal citation omitted).

We do not hold that criminal possession of a weapon may never support a felony assault conviction. In circumstances where, unlike here, the continued possession of the weapon underlying the felony assault charge is threatened before the assault takes place, a jury might reasonably infer that the assault was committed to prevent the victim from disarming his assailant (i.e., that the victim was assaulted in furtherance of the assailant's continued possession). For example, had Marquez responded to a threatened robbery by reaching for Cherry's gun in an attempt to disarm him, then a jury might reasonably conclude that Cherry caused Marquez's injuries in furtherance of his continued possession of that weapon.

Unlike that example, however, the evidence offered in this case demonstrated that Cherry, Brownlee, and Wyman ambushed Robert and Marquez. Far from responding to any attempts to disarm them, the gunmen appeared on the scene without warning,

17

immediately opened fire on the officers, and injured Marquez in their initial attack. There was no manifest threat prior to the ambush that might permit a jury to conclude, beyond a reasonable doubt, that the assault was in furtherance of retaining possession of the conspirators' own weapons. The State effectively concedes as much in its reply brief by providing an example of an assault *not* in furtherance of possession of a weapon:

> [S]uppose that Individual A had a motive to harm Individual B. And suppose that Individual A [was] walking down the street, armed with a weapon; that individual A happened to see Individual B; and that Individual A took out his weapon and shot Individual B, causing him physical injury or serious physical injury. Under that scenario, Individual A would not be guilty of felony assault, for the simple reason that, under that scenario, there would be no evidence that the shooting was "in furtherance" of the weapon possession.

That example of an ambush on an unsuspecting victim precisely fits the facts of this case.

The State nevertheless argues that the assault was committed in furtherance of retaining possession of the very weapons used in the assault. Unable to rely on any active – or even threatened – attempts to disarm Cherry and his crew, the State speculates that the gunmen "must have concluded that" Robert and Marquez would try to disarm them and, therefore, part of the reason for the shooting was to maintain their possession of the guns.[10]

---

[10] At times, the State appears to argue that, because both the assault and the possession were in furtherance of the attempted robbery, they must have been in furtherance of each other as well. This claim rests on the logical fallacy that one of two independent efforts to bring about the same end necessarily aids the other. In furtherance of preparing for a

18

That theory, however, requires us to engage in pure conjecture untethered from the evidence presented at trial. As the prosecutor stated in summation,

> [Langston] didn't think that Artie Marquez or John Robert were undercover officers who could protect themselves, who could defend themselves, who had guns of their own, who were trained on how to use those guns and use those guns to save their lives. He thought they were crooks. He thought they were gun traffickers, perfect victims of crime.

(Tr. 1089.) All of the evidence presented at trial supports the prosecutor's own argument that Langston and his fellow conspirators were unaware of the officers' ability to protect themselves. Robert and Marquez were posing as prospective purchasers, rather than current owners, of handguns. Neither Robert nor Marquez revealed their weapons prior to the shooting. Langston, who testified at trial, never implied that he believed that the officers were armed. There was no evidence that the shooters believed that merely displaying their weapons and demanding the purported purchasers' money would have put their guns at risk, or that their actions were motivated by anything other than a desire to injure and steal. In sum, there simply was no evidence indicating that Langston and his accomplices saw Robert and Marquez as a threat to their own continued weapon possession or that Cherry, Brownlee, and Wyman opened fire in order to protect the very

---

successful vacation one might both stop the mail and pack a suitcase. Although both of these actions further the success of the planned vacation, it cannot be inferred that the packing was done in furtherance of stopping the mail. Neither can it be logically inferred that, because both the possession and the assault were committed in furtherance of an attempted robbery, the assault was committed in furtherance of the possession.

19

guns that they used in the attack.[11] We cannot project into the gunmen's minds those thoughts necessary to sustain the conviction when the evidence presented at trial does not support it and the prosecution's own summation flatly rejected it.

The mere fact that Langston and his accomplices had reason to believe that Robert and Marquez were criminals does not change this calculation. "[I]t could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." Jackson, 443 U.S. at 320; cf. Brown v. Palmer, 441 F.3d 347, 352-53 (6th Cir. 2006) (distinguishing between "reasonable speculation" and "sufficient evidence" in addressing habeas relief under Jackson v. Virginia). Allowing a conviction to stand on this evidence would read the "in furtherance of" requirement out of the statute, exactly what the New York courts and the New York legislature have counseled against. Therefore, we conclude that the evidence at trial was constitutionally insufficient to sustain Langston's conviction for felony assault.[12]

---

[11] Indeed, it makes no sense to infer that the gunmen acted in furtherance of the possession of the weapons used to shoot Marquez when those weapons were taken from a place of complete safety and brought to the sixth floor where they were displayed and fired. No reasonable jury could find, beyond a reasonable doubt, that Cherry, Brownlee, and Wyman took their guns out from wherever they were stored, burst through the hallway door, and began firing on the unsuspecting officers in order to retain possession of those very guns.

[12] Nor is there merit to the State's alternative theory, that the assault was committed in furtherance of the possession, not of the guns used in the assault, but of the weapons that the officers initially intended to buy. The State argues that the jury may have believed that Langston and his accomplices feared that Robert and Marquez would lose their patience, locate the four 9mm handguns that they had come to purchase, and try to take them by force,

20

While we conclude that Langston's due process rights were violated, in order to grant the writ it is not enough for us merely to disagree with the state appellate court's conclusion about the sufficiency of the evidence; rather, habeas corpus will be granted only if the state court applied Jackson v. Virginia in an unreasonable manner. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 411 (2000); see also Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001). Furthermore, since Jackson calls for the application of a "general" standard, the state court is entitled to additional "leeway." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

However, even after giving the state court the appropriate deference, we can think of no reasonable application of Jackson that would permit affirmance of Langston's conviction.[13] The prosecution presented no evidence to support its theory that Langston's

and that, to prevent that from happening, the conspirators decided to neutralize the threat by shooting the officers before they could seize the hidden weapons. However, no evidence that Langston (or any other participant in the crime) ever possessed the guns that Moultrie had agreed to sell to the officers was presented at trial. To the contrary, the prosecutor emphatically argued to the jury that "there were no guns for sale" and thus that the proposed sale was, from the beginning, a ruse to set up the intended robbery. (Tr. 1019.) Absent evidence that these guns even existed, a conviction under this theory would be "based on speculation and surmise alone" and would therefore violate the Due Process Clause. D'Amato, 39 F.3d at 1256; see also Jackson, 443 U.S. at 314 ("[A] total want of evidence to support a charge will conclude the case in favor of the accused."); United States v. Broxmeyer, 616 F.3d 120, 126-27 (2d Cir. 2010). If the state appellate court relied on this theory, despite its total lack of evidentiary support, in denying Langston relief, it would necessarily have acted unreasonably. See Fiore v. White, 531 U.S. 225, 229 (2001).

[13] Nor does the Appellate Division's single-sentence rejection of Langston's argument provide us with such an explanation. The totality of the state appellate court's analysis is

21

accomplices acted in furtherance of their continued possession of the very weapons that they used to ambush Robert and Marquez. As a result, the jury would have had to rely on pure conjecture to establish an element of the offense beyond a reasonable doubt. Insofar as the state appellate court found otherwise, its ruling unreasonably applied Jackson v. Virginia.

**CONCLUSION**

Although both Jackson v. Virginia and 28 U.S.C. § 2254(d)(1) dictate deferential standards, this is one of the rare cases where no reasonable jury could conclude that the prosecution proved guilt beyond a reasonable doubt, and the state appellate court unreasonably applied Jackson v. Virginia in reaching a contrary conclusion. We therefore AFFIRM the district court's grant of Langston's petition.

---

contained in the conclusory statement that "[t]he people also established by legally sufficient evidence that the defendant was guilty of assault in the first degree." People v. Langston, 806 N.Y.S.2d at 887. Nevertheless, the court's error is understandable. Although Langston preserved his insufficiency argument for appellate review, the briefing that the state appellate court received masked the strength of his claim. Langston devoted less than five pages of his fifty-page appellate brief to this issue, and the State's opposing brief mischaracterized Langston's insufficiency claim as resting on the assertion "that the resulting injury had to advance the cause of the [underlying] felony," an argument that the New York Court of Appeals has expressly rejected. See Slaughter, 577 N.Y.S.2d at 209-10. Langston's reply brief failed to respond to this mischaracterization of his argument. Moreover, given the manner in which this case was tried and Langston's argument to the Appellate Division that he was not involved in planning a robbery, it would have been easy to misunderstand the conviction to have been based on the obvious – but as this case was tried, legally unavailable – theory that the assault was committed in furtherance of an attempted robbery.