20-842-cr(L)
*United States v. Hoskins*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2021

(Argued: August 17, 2021                    Decided:  August 12, 2022)

Docket Nos. 20-842, 20-1061, 20-1084


_____


UNITED STATES OF AMERICA,

*Plaintiff-Appellant-Cross-Appellee*,

v.

LAWRENCE HOSKINS,

*Defendant-Appellee-Cross-Appellant*.[1]


_____


Before: NEWMAN, POOLER, and LOHIER, *Circuit Judges*.

---

[1] The Clerk of the Court is directed to amend the caption as above.

The government appeals from the February 26, 2020 judgment of the United States District Court for the District of Connecticut (Arterton, *J.*) granting Lawrence Hoskins's motion, following a jury trial, for judgment of acquittal following his conviction for violations of the Foreign Corrupt Practices Act ("FCPA") and conspiracy to do the same. Hoskins cross-appeals, challenging (1) the denial of his motion to dismiss the indictment on Speedy Trial Act and Sixth Amendment grounds, (2) certain jury instructions regarding withdrawal from a conspiracy, and (3) the district court's denial of his motion for judgment of acquittal based on the jury instructions given as to venue for four money-laundering counts.

We hold that the district court properly granted Hoskins's motion for judgment of acquittal for violations of the FCPA because there was no agency or employee relationship between Hoskins and Alstom Power, Inc. We also affirm the district court's Speedy Trial Act and Sixth Amendment rulings, as well as its instructions to the jury about withdrawal from a conspiracy and venue in the District of Connecticut. Consequently, we **affirm** the orders and judgment of the district court.

Affirmed.

Judge Lohier concurs in part and dissents in part in a separate opinion.

—————————————

DAVID E. NOVICK, Assistant United States Attorney (David P. Burns, Acting Assistant Attorney General, Brian C. Rabbitt, Former Acting Assistant Attorney General, Daniel S. Kahn, Senior Deputy Chief, Fraud Section, United States Department of Justice, Lorinda I. Laryea, Assistant Chief, Fraud Section, United States Department of Justice, Sandra S. Glover, Assistant United States Attorney, *on the brief*), *for* John H. Durham, United States Attorney, District of Connecticut, New Haven, CT, *for Plaintiff-Appellant— Cross-Appellee*.

CHRISTOPHER J. MORVILLO, Clifford Chance US LLP, (Daniel S. Silver, Celeste L.M. Koeleveld, Benjamin Peacock, *on the brief*), New York, NY, *for Defendant-Appellee-Cross-Appellant*.

Frederick T. Davis, International Academy of Financial Crime Litigators, New York, NY, *amici curiae in support of Defendant-Appellee-Cross-Appellant*.

Richard M. Strassberg (Lindsay A. Lewis, Vice Chair, Amicus Curiae Committee of the National Association of Criminal Defense Lawyers, James D. Gatta, Andrew Kim, Emily M. Notini, Daniel M. Gitner, Jeannie Rose Rubin, *on the brief*), New York, NY, *amici curiae in support of Defendant-Appellee-Cross-Appellant*.

3

POOLER, *Circuit Judge*:

The American subsidiary of Alstom Power, Inc. ("API"), a global power and transportation services company, hired two consultants to bribe Indonesian officials to help secure a $118 million power contract. Lawrence Hoskins, who worked in Paris for API's United Kingdom subsidiary, was allegedly responsible for approving the selection of the consultants and authorizing payments to them. For his role in the alleged bribery scheme, Hoskins was charged in an American court with (among other things) violating the Foreign Corrupt Practices Act ("FCPA"), which makes it unlawful for officers, directors, and agents "of a domestic concern" to use interstate commerce corruptly to bribe or attempt to bribe foreign officials. 15 U.S.C. § 78dd *et seq.*

Because Hoskins is not an American citizen, was not employed by the American subsidiary, and did not enter the United States while allegedly working on the scheme, he falls outside the category of persons directly covered by the FCPA. The government nevertheless contended that Hoskins was liable under the FCPA as a co-conspirator or accomplice to the American subsidiary's FCPA violation. Earlier in this litigation, we rejected that theory and held that a

4

person could not be "guilty as an accomplice or a co-conspirator for an FCPA crime that he or she is incapable of committing as a principal[.]" *United States v. Hoskins* ("*Hoskins I*"), 902 F.3d 69, 76 (2d Cir. 2018). The government then revised its prosecutorial theory, arguing Hoskins's work for API's American subsidiary rendered him an "an agent" of "a domestic concern"—a category of persons squarely within the FCPA's terms. *See* 15 U.S.C. § 78dd-2. The jury convicted Hoskins of eleven counts, seven of which were FCPA violations, and four of which were money laundering charges, and acquitted him on one count of money laundering. Hoskins then moved for acquittal, arguing he was not an agent within the meaning of the FCPA. The district court granted that motion, *see United States v. Hoskins* ("*Hoskins II*"), 3:12cr238 (JBA), 2020 WL 914302, at *7, *13 (D. Conn. Feb. 26, 2020), and the government brought this appeal.

Hoskins cross-appeals, arguing that (1) the district court erred in determining there was no violation of the Speedy Trial Act ("STA"), 18 U.S.C. §§ 3161(c)(1), 3162(a)(2), nor any violation of the Sixth Amendment during the lengthy course of trial; (2) the district court erred in giving jury instructions regarding withdrawal from the conspiracy and liability for setting a conspiracy

in motion; and (3) the district court erred in denying his Rule 29 motion for judgment of acquittal based on faulty jury instructions regarding venue in the District of Connecticut.

We affirm, and hold that the United States District Court for the District of Connecticut (Arterton, *J.*) properly acquitted Hoskins under Rule 29 because there was no agency or employee relationship between Hoskins and API. We also affirm on the cross-appeal, finding no error in either the district court's speedy trial analysis or its jury instructions.

## BACKGROUND

### I. API, Hoskins, and the Tarahan Project

Alstom S.A. is a global corporation headquartered in France that provides power and transportation services. *Hoskins I*, 902 F.3d at 72. Alstom has a United States-based subsidiary, API, located in Connecticut. As detailed in *Hoskins I*, the government alleged that API and other affiliates of Alstom retained two "consultants" who bribed Indonesian officials in order to secure a $118 million power contract with the Indonesian government for API and certain other partners, referred to as the "Tarahan Project." *Id.* Between November 2001 and

6

August 2004, Hoskins was employed by Alstom's UK subsidiary, but was assigned to work in its French subsidiary, Alstom Resources Management S.A. *Id.* Specifically, Hoskins worked in the subsidiary's International Network ("IN") department, which was an internal-facing "support organization" that provided operational business units with support "on an as-needed basis." App'x at 287.

During the relevant time, Hoskins was the Area Senior Vice President for the Asia region in the IN. He performed various functions for and on behalf of Alstom subsidiaries, including API. One project in which Hoskins was involved was the Tarahan Project, which sought to secure a $118 million contract with the Indonesian government to build a coal-fired power plant. The bidding for the project was being conducted by Indonesia's state-owned and controlled electricity company, Perusahaan Listrik Negara ("PLN"). At the time, API was looking for a way to bribe PLN and other officials to ensure that PLN would give the contract to a consortium led by API. The other members of the consortium were a Japanese trading company, Marubeni Corporation, and Alstom's Indonesian subsidiary, Alstom Power Energy Systems Indonesia ("PTESI").

7

In 2002, Hoskins and his alleged API co-conspirators discussed hiring a consultant named Harsono, who had connections with Emir Moeis, a high-ranking member of the Indonesian Parliament. During these early stages of the project, Fred Pierucci, the head of boiler sales worldwide for Alstom, asked Hoskins to check in with two Alstom Indonesia leaders—Reza Moenaf, the Alstom "country president" for its Indonesia business who reported to Hoskins, and Eko Sulianto, who reported to Moenaf—regarding the "latest position on Tarahan." App'x at 860. Moenaf sent an email to Frederic Pierucci and David Rothschild, the regional sales manager for API who worked on the Tarahan Project, stating: "According to [Hoskins], [Pierucci] has already given his 'go-ahead' to proceed with the proposed consultant[.]" App'x at 862. In response to another of Moenaf's emails, Pierucci responded, "Please go ahead and finalise the consultancy agreement. Please send me the key data so that I can approve it officially." App'x at 863.

Before finalizing this arrangement, Rothschild expressed concern that Harsono was too close to Moeis, which would make the bribery too obvious, and instead suggested hiring another consultant named Pirooz Sharafi, who was

8

based in Maryland, and his company, Pacific Resources, Inc. Sharafi had a close personal relationship with Moeis. Pierucci agreed with Rothschild's recommendation. Moenaf pushed back because he did not think that Sharafi had the requisite connections with PLN's Tarahan Project team. Nevertheless, API hired Sharafi and Pacific Resources, and Moenaf facilitated the execution of the consultancy agreement, committing 3 percent of the ultimate contract price to Sharafi if API won the bid.

By 2003, Moenaf's concerns came to fruition, when the PLN evaluation committee expressed dissatisfaction with Sharafi and questioned his commitment to bribing them. Larry Puckett, another API sales representative, told Pierucci via email that PLN's president was dissatisfied. Puckett explained that API's consortium partner, Marubeni, wanted API, "particularly . . . Pierucci to agree to take . . . immediate action" on finding a new consultant. App'x at 883.

Subsequently, Pierucci, Hoskins, William Pomponi, an API employee, and Marubeni representatives, among others, met in Jakarta, where Sharafi was informed that API needed to switch to a different arrangement with a different consultant who was in better standing with PLN: Azmin Aulia and his

9

consulting company, PT Gajendra. They informed Sharafi that his commission would be cut to 1 percent, while Aulia would be retained at a 2 percent commission. On another occasion, Hoskins, Sharafi, and Thiessen met with Aulia to confirm his commitment to a 2 percent commission on his consulting agreement. Communications and testimony about this friction identified Pierucci as the ultimate decision-maker regarding the switch. Pierucci directed Hoskins to issue the revised consulting agreements, and Hoskins directed people in his department to execute them.

The plan encountered troubles when Aulia complained to Moenaf (who reported to Hoskins) that Aulia was concerned about paying bribes up front and not receiving any compensation for years. Hoskins proposed offering Aulia a better payment schedule and asked Pierucci for the "all clear" before communicating the new terms to the consultants. App'x at 934-37. Once the agreements were finally in place, Pierucci thanked the team, commending Pomponi for "leading this negotiation" and Hoskins for "the local support." App'x at 938. API paid its consultants, who, in accordance with the consulting

agreements, bribed the Indonesian officials. Hoskins resigned from Alstom effective August 31, 2004.

**II.    The District Court Proceedings**

**A. Overview**

In July 2013, Hoskins was indicted on 12 counts: conspiring to violate the FCPA, pursuant to 18 U.S.C. § 371 (Count One); substantive violations of the FCPA, pursuant to 15 U.S.C. § 78dd-2 and 18 U.S.C. § 2 (Counts Two-Seven); conspiring to launder money, pursuant to 18 U.S.C. § 1956(h) (Count Eight); and substantive money laundering, pursuant to 18 U.S.C. § 1953(a)(2)(A) and 18 U.S.C. § 2 (Counts Nine-Twelve). Discovery and other issues, including an interlocutory appeal, proceeded over many years, and trial did not begin until October 28, 2019. The jury convicted Hoskins on the FCPA violations, conspiracy to launder money, and substantive money laundering charges, and acquitted him on Count Eleven. The jury was not asked to make any special findings as to whether it found Hoskins to be an agent. On March 6, 2020, the district court sentenced Hoskins to 15 months' imprisonment.

11

**B. Interlocutory Appeal**

Hoskins moved to dismiss Count One of the indictment, arguing that the FCPA statute "prescribes liability only for narrowly-circumscribed groups of people—American companies and citizens, and their agents, employees, officers, directors, and shareholders, as well as foreign persons acting on American soil" and that the government could not circumvent that limitation by charging Hoskins on aiding and abetting or conspiracy theories. *Hoskins I*, 902 F.3d at 73. The district court dismissed Count One to the extent it sought to charge Hoskins with conspiring to violate Section 78dd-2 of the FCPA without demonstrating that Hoskins fell into one of the FCPA's enumerated categories and conspiring to violate Section 78dd-3, which prohibits acts in the territory of the United States, because Hoskins was never in the United States during the relevant period. *Id.* at 74. However, the district court denied Hoskins's motion to dismiss to the extent Count One alleged that Hoskins conspired to violate or aided and abetted the violation of the FCPA as an "agent of [a] domestic concern," an enumerated category of persons under the FCPA. 15 U.S.C. § 78dd-2; *see also Hoskins I*, 902 F.3d at 74.

12

The issues raised by the district court's decision were the subject of an interlocutory appeal. We held "that Congress did not intend for persons outside of the statute's carefully delimited categories to be subject to conspiracy or complicity liability." *Hoskins I*, 902 F.3d at 83-84. Therefore, while the statute articulated multiple categories of individuals subject to the FCPA, it did not provide "jurisdiction over a foreign national who acts outside the United States, but not on behalf of an American person or company as an officer, director, employee, agent, or stockholder." *Id.* at 85.

**C. Post-Trial Motions**

On the interlocutory appeal, we noted that the government could proceed on its alternate theory—that Hoskins was an "agent of a domestic concern" and therefore could be "liable…. for the substantive FCPA counts charged in the indictment." *Id.* at 97-98. To prevail on this theory, we noted that the government would need to establish at trial that (1) Hoskins was an agent; and (2) Hoskins "conspir[ed] with foreign nationals who conducted relevant acts while in the United States," pursuant to Section 78dd-3. *Id.* at 98. After our mandate issued, the government proceeded in the district court on this theory.

13

Following the return of the verdict, Hoskins moved for judgment of acquittal or for a new trial, primarily arguing that the evidence was insufficient for the jury to have found beyond a reasonable doubt that Hoskins was an agent of API. Hoskins argued that API lacked the power to fire him or control his day-to-day work, such that a reasonable juror could not find API was his principal. He pointed out that pursuant to Alstom's organizational chart, API actually needed Hoskins's approval of the consulting agreements for the project to progress. Hoskins also argued that venue in Connecticut was not established as to Counts Nine, Ten, and Twelve (the money laundering charges).

As to the question of agency, the district court drew (as it must) all inferences in favor of the government that "API both 1) controlled the hiring of consultants for the Tarahan Project, and 2) gave Mr. Hoskins instructions, which he followed." *Hoskins II*, 2020 WL 914302, at *7. However, the court concluded that the government failed to adduce evidence to "support the conclusion that Mr. Hoskins acted subject to API's control such that Mr. Hoskins was an agent of API." *Id.* The court reasoned that although API might have been the final decision-maker as to which consultant to hire and on which terms, the emails

14

and testimony produced at trial did not demonstrate that API had any authority to control Hoskins's interim actions as those contracts were finalized, which is key to establishing a principal-agent relationship. *Id.* at *8. The court also found it relevant that Pierucci, within Alstom's overall organizational chart, did not have any authority to "fire, reassign, demote, or impact the compensation of Mr. Hoskins." *Id.* The court granted Hoskins's motion for acquittal on the FCPA counts, (one through seven). *Id.* at *9. The court also conditionally granted the motion for a new trial on those counts "if the judgment of acquittal is later vacated or reversed." *Id.* at *13.

The district court denied Hoskins's Rule 29 motion for judgment of acquittal based on improper venue. The district court found sufficient evidence for a rational juror to conclude that Hoskins knew the relevant payments would pass through the United States. *Id.* at *11. The court also rejected Hoskins's theory that the payments—which went from API in Connecticut to Sharafi in Maryland, and then from Maryland to Indonesia—did not constitute a single, continuing transaction. *Id.* at *11-12. These appeals followed.

**DISCUSSION**

## I.     The FCPA Counts

We review de novo a district court's grant of a Rule 29 motion for judgment of acquittal, and we must uphold a judgment of conviction where "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). In so doing, "we must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (internal quotation marks omitted). "We 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).

16

Although we must "view the evidence with all reasonable inferences drawn in the Government's favor," "we may not permit that rule to displace the even more important rule that all elements of an offense must be proven beyond a reasonable doubt." *Pauling*, 924 F.3d at 662 (quoting *United States v. Martinez*, 54 F.3d 1040, 1049 (2d Cir. 1995) (Newman, *C.J.*, dissenting)). "[W]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that element, like all elements, beyond a reasonable doubt." *Pauling*, 924 F.3d at 657 (quoting *Martinez*, 54 F.3d at 1043).

**A. "Agency" Within the Meaning of the FCPA**

The crux of this appeal is whether there was an agency relationship between Hoskins and API. "At common law, agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests or otherwise consents so to act." *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 79 (2d Cir. 2019) (brackets and some

17

internal quotation marks omitted). "The three elements necessary to an agency relationship are (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013) (internal quotation marks omitted). The agent has the authority—express or implied--to "act or to conduct a transaction on account of the principal which . . . he is privileged to do because of the principal's manifestations to him." *Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996) (internal quotation marks omitted); *see also Bank of New York v. Yugoimport*, 745 F.3d 599, 610 (2d Cir. 2014) ("A principal-agent relationship is created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that other party by words or actions." (internal quotation marks omitted)).

Some factors a court considers in deciding whether an agency relationship exists include: "the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in

18

question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done."

*Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (quoting *Columbia Broad. Sys., Inc. v. Stokely–Van Camp, Inc.*, 522 F.2d 369, 375-76 (2d Cir. 1975)).

**1.  Hoskins Was Not an Agent of API Within the Meaning of the FCPA**

The parties agree that the common law meaning of agency we apply here is the correct one.[2] There was no explicit or implied agency or employee relationship between Hoskins and API such that the elements of an agency relationship were proven beyond a reasonable doubt. Hoskins was employed by a different subsidiary, within the IN department, which provides global support to all sales and operational subsidiaries. The record demonstrates that Hoskins's actions in furtherance of securing consultants for the Tarahan Project were all subject to the decision-making of Pierucci and other executives of API.

---

[2] Although amici have thoroughly briefed the issue, Hoskins's brief merely sets out a footnote stating that both parties agreed to proceed with a common-law definition of agency. We thus decline the invitation of amici to delve further into the issue. *See United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

Conspicuously missing from the evidence is anything indicating that Pierucci or other API representatives actually controlled Hoskins's actions as Hoskins and his API counterparts operated under separate, parallel employment structures. Pierucci did not hire Hoskins, lacked the ability to fire Hoskins, and lacked any say in Hoskins's compensation. This lack of control over Hoskins is fundamental to the question of whether Hoskins was an agent because the "chief justifications for the principal's accountability for the agent's acts are the principal's ability to select and control the agent and to terminate the agency relationship, together with the fact that the agent has agreed expressly or implicitly to act on the principal's behalf." Restatement (Third) of Agency § 1.01 cmt. c.

There is, of course, some evidence of direction from Pierucci and API to Hoskins. Pierucci asked Hoskins to execute certain tasks, such as revising agreements and sending them to API. Hoskins asked for approval from API before moving forward with Aulia, indicating that he looked to API for instruction. App'x at 934-37. And the record shows Hoskins located and hired

20

consultants at the behest of API and that these consultant contracts required Hoskins's approval.

Yet the fact that Hoskins collaborated with and supported API and Pierucci does not mean he was under their control within the meaning of the FCPA. Identifying consultants to become agents of API does not make Hoskins himself an agent of API. Nor does reviewing contracts for API to make sure they complied with API standards make Hoskins an agent. The government argues that because Hoskins provided API with support, he is an agent. But the government cites to no authority that supports such a broad definition of "agent" within the meaning of FCPA.

At bottom, the government failed to present sufficient evidence to allow the jury to find an agency relationship. Indeed, the record demonstrates Hoskins and API's relationship lacks key elements of agency, such as any indication that Hoskins had any authority to act on API's behalf, and whether API could "revoke" any authority it purportedly gave to Hoskins, or even do anything to control Hoskins's actions. *See* 12 Williston on Contracts § 35:30 (4th Ed. 2021) (explaining that a principal has the authority to revoke an agent's power orally

21

or otherwise); Restatement (Third) of Agency § 1.01 cmt. c. The government argues that API revoked Hoskins's authority when it declined to go with Harsono, whom Hoskins and Moenaf suggested as a consultant, instead going with Sharafi. This can hardly be said to be a revocation of authority, but rather a collaboration between multiple corporate employees and subsidiaries to obtain the desired result: finding an effective but not incriminating consultant.

There is no evidence that Hoskins was authorized to enter into any agreements on API's behalf. The government itself notes that "Hoskins could not hire a consultant without API's instruction." Govt's Br. at 55. Yet a hallmark of a principal-agent relationship is that an agent can bind principals to certain legal commitments. *See* Restatement (Third) of Agency § 1.01 cmt. c (explaining that agents have "power to affect the principal's legal relations through the operation of apparent authority"). While Hoskins may have supported API by attending meetings with consultants in Jakarta, it was ultimately API that did the negotiating and contracting. For example, one of the government's key pieces of evidence was a meeting at a hotel in Jakarta where Sharafi agreed to reduce his commission from 3 to 1 percent, with Aulia receiving the 2 percent difference.

Yet there is no indication that Hoskins had any authority to negotiate these percentages nor that he served as anything more than a messenger for API at this meeting. *Minskoff*, 98 F.3d at 708 (describing how an agent has the authority to conduct a transaction for the principal because of the principal's manifestations). The fact that Hoskins supported the Tarahan Project, which API had control over, does not support a finding of a principal-agent relationship. Hoskins supported API's endeavors because of his role within the IN department of Alstom, not because API granted him agency authority.

Likewise, the facts the dissent points to do nothing more than illustrate why there was no agency relationship. The dissent writes that the government had to prove "only that API could terminate his involvement — and thus revoke his authority — at least in part." Dissent at 6. Yet the dissent, like the government at trial, fails to specify any facts showing that API could terminate its relationship with Hoskins or otherwise exerted control over Hoskins. As discussed above, there is no doubt that Hoskins supported API and identified consultants, but the dissent's argument requires extrapolating facts that do not appear in the record, instead of the appropriate course of drawing permissible

23

inferences in the government's favor. "[I]t is not enough that inferences in the government's favor are permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that element, like all elements, beyond a reasonable doubt." *Pauling*, 924 F.3d at 657 (citation omitted). Here, such inferences are not supported by any facts in the record.

Our affirmance of the district court's judgment of acquittal is not done lightly. We have viewed all evidence with reasonable inferences drawn in the government's favor, but "we may not permit that rule to displace the even more important rule that all elements of an offense must be proven beyond a reasonable doubt." *Id.* at 662. While there is some evidence that Hoskins supported API in his working relationship with the corporation, it is not sufficient to establish that API exercised control over the scope and duration of its relationship with Hoskins. Without this control over the relationship, there can be no finding of a principal-agent relationship within the meaning of the FCPA.[3]

---

[3] Although we have applied the appropriately deferential standard of review to the jury's verdict, challenged for lack of sufficient evidence to permit a reasonable jury to find the elements established guilt beyond a reasonable doubt,

24

**II.    Hoskins's Speedy Trial Act and Sixth Amendment Claims**

Hoskins cross-appeals, arguing that the district court committed reversible error by denying his motion to dismiss the indictment for violations of the Speedy Trial Act ("STA") and the Speedy Trial Clause of the Sixth Amendment. The STA requires a defendant's trial to commence within 70 days of his indictment or first appearance (whichever is later) and entitles a defendant to dismissal of the charge if that does not happen. 18 U.S.C. §§ 3161(c)(1), 3162(a)(2). Some periods of time are automatically excluded from the STA clock, including, as relevant here, time related to an interlocutory appeal, filing of pretrial motions, and up to 30 days when a "proceeding concerning the defendant is actually under advisement by the court." *Id.* § 3161(h)(1)(C), (D), (H).

A district court may also grant exclusions based on a "finding[] that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). "Although the

---

we note that this is not the typical challenge to the sufficiency of evidence where the dispute is about whether there was evidence to support an implicit finding of one or more critical facts. Here the jury was required to apply the law of agency for purposes of the FCPA to what were essentially undisputed facts.

25

[STA] is clear that the findings must be made, if only in the judge's mind, before granting the continuance . . . , the [STA] is ambiguous on precisely when those findings must be set forth, in the record of the case. However this ambiguity is resolved, at the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Zedner v. United States*, 547 U.S. 489, 506-07 (2006) (brackets and internal quotation marks omitted). Therefore, time may be properly excluded pursuant to an ends-of-justice finding even if the court fails to "utter the magic words 'ends-of-justice' at the time of ordering the continuance" where it is clear that the court considered the underlying factors and concerns. *United States v. Breen*, 243 F.3d 591, 597 (2d Cir. 2001). When considering STA claims, we review findings of fact for clear error and legal conclusions de novo. *United States v. Lynch*, 726 F.3d 346, 351 (2d Cir. 2013).

The Sixth Amendment of the Constitution guarantees "the right to a speedy and public trial." U.S. Const. amend. VI. The Sixth Amendment analysis is guided by four factors: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v.*

26

*Wingo*, 407 U.S. 514, 530 (1972). Prejudice to the defendant considers the "interests of defendants" that the Speedy Trial Clause was designed to protect: (1) "prevent[ing] oppressive pretrial incarceration", (2) "minimiz[ing] anxiety and concern of the accused", and (3) "limit[ing] the possibility that the defense will be impaired." *Id.* at 532. The last of these is the most important. *Id.* "We review the district court's balancing of [the *Barker*] factors for abuse of discretion." *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012).

**A. The District Court Findings on the STA and the Speedy Trial Clause**

The relevant factual background and a more detailed description of the lengthy delay between Hoskins's first indictment on July 30, 2013 and his trial, which started October 28, 2019, are in the district court's order denying Hoskins's motion to dismiss the indictment because of STA and Speedy Trial Clause concerns. *See Hoskins II*, ECF No. 501.

Hoskins moved to dismiss the indictment with prejudice on July 15, 2019, based on alleged STA and Speedy Trial Clause violations. On August 2, 2019, the district court issued retroactive orders excluding time under the STA from the September 12, 2018, status conference to March 11, 2019, and then again from

27

March 11, 2019, through September 9, 2019, the anticipated trial date at the time. On August 15, 2019, relying on its after-the-fact order excluding time under the STA, the district court denied Hoskins's motion to dismiss the indictment, finding that only 15 days had elapsed under the STA clock.

The district court also analyzed the *Barker* factors and found: (1) the length of delay was remarkable, a factor favoring Hoskins; (2) the reasons for the delay were due to the various needs of both parties, and this factor was neutral; (3) Hoskins had not previously asserted his rights under the Speedy Trial Clause, and this factor weighed against him; and (4) despite asserting that some witnesses had become unavailable or had forgotten things due to the delay, Hoskins was unable to provide specific instances of evidentiary prejudice to the point of significant impairment to his defense. Overall, the court concluded, the *Barker* factors did not favor Hoskins. Therefore, the district court denied Hoskins's motion to dismiss. Both parties appear to agree that 15 days of the STA clock had expired in the proceedings leading up to the issuance of our mandate in the interlocutory appeal on October 31, 2018.

28

## B. The District Court Did Not Commit Reversible Error in Denying Hoskins's Motion to Dismiss the Indictment

The length of time that passed between Hoskins's first indictment and his trial is extraordinary. Nevertheless, Hoskins cannot show he is entitled to relief under either the STA or the Speedy Trial Clause. The district court's stated concerns about the age of the case during the September 2018 and January 2019 status conferences, along with its August 2, 2019, after-the-fact ends-of-justice finding, satisfied its STA obligations. Prior to filing its order denying Hoskins's motion to dismiss the indictment on STA grounds, the district court issued a short order making retroactive ends-of-justice findings for the period between September 2018 and September 2019. Although we disfavor this practice and prefer "contemporaneous finding[s] on the record," the district court did not need to explicitly utter the words "ends-of-justice." *Breen*, 243 F.3d at 597. The Supreme Court has set the outer bounds of making this finding explicit, "at the very least[,] . . . by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Zedner*, 547 U.S. at 507. The district court did so here. Additionally, given the court's repeated references to the age of the case and attempts to press counsel into earlier trial dates during both the September 2018

29

and January 2019 conferences, the court implicitly made an ends-of-justice finding, "if only in [her] mind." *Id.*

As for the Speedy Trial Clause, the district court did not abuse its discretion in weighing the *Barker* factors. There was an extremely lengthy delay in the six years from Hoskins's indictment and his first day of trial, which favors Hoskins. *Barker*, 407 U.S. at 533 (describing delay of over five years as "extraordinary"). The second factor looks to the reasons for delay, which the district court found neutral. *Id.* at 530. The district court properly reasoned that both sides contributed to the delay and that the government's interlocutory appeal was not a frivolous ploy to delay the trial. The third factor looks at when the defendant asserted his Speedy Trial Clause rights. *Id*. Hoskins did not assert his STA rights until his motion to dismiss the indictment in July 2019, which weighs against him in the *Barker* analysis. *Id.* The final factor is prejudice to the defendant, which includes prejudice from incarceration, the anxiety caused by the delay, and the possibility that defense will be impaired. *Id.* at 530, 532. Here again, the district court did not abuse its discretion. Hoskins was held in pre-trial detention for a total of 27 days but was otherwise able to travel, see family, and

30

reside outside the United States while trial was pending. The district court found that Hoskins's defense was not impaired by the delay because he did not identify any particular prejudice to his defense. Likewise on appeal, Hoskins identifies certain excerpts of witness testimony where witnesses misremembered or forgot certain details, but none of these instances are central to the criminal conduct at issue here, and he does not explain how he was prejudiced by this testimony. Ultimately, the district court's analysis of the *Barker* factors and dismissal of Hoskins's Sixth Amendment claim falls "within the range of permissible decisions." *United States v. Ghailani*, 733 F.3d 29, 44 (2d Cir. 2013).

### III. The District Court's Jury Instructions Did Not Constitute Error

Next, Hoskins argues that the district court's jury instructions on withdrawal from a conspiracy constitute reversible error. "We review a claim of error in jury instructions *de novo*, reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) (citation and internal quotation marks omitted).

Withdrawal from a conspiracy does not necessarily "negate" participation in the crime. *Smith v. United States*, 568 U.S. 106, 110 (2013). Withdrawal

31

"presupposes that the defendant committed the offense," so it "achieves more modest ends than exoneration." *Id.* at 111. "Withdrawal also starts the clock running on the time within which the defendant may be prosecuted." *Id.* But "[t]o avert a continuing criminality there must be affirmative action to disavow or defeat the purpose of the conspiracy." *Id.* at 113 (alterations and internal quotation marks omitted). The burden of establishing withdrawal rests on the defendant. *Id.*

During pre-trial motion practice, the two parties litigated the language of the withdrawal instructions. There were disputes over: whether resignation, without an affirmative act of disavowal, constitutes withdrawal; whether the government's proposed instruction—that once a defendant sets a conspiracy in motion, his withdrawal must weaken the conspiracy to be effective—was proper; whether the government's proposal to provide examples of informing authorities or announcing abandonment to co-conspirators was proper; and whether withdrawal applies to aiding and abetting liability. In a pre-trial order, the district court deferred ruling on the business-resignation and set-in-motion instructions until evidence was presented at trial. However, the court noted that

32

Hoskins's cited cases did not negate the fact that a defendant must commit some affirmative act to withdraw from a conspiracy. The district court also ruled that withdrawal does not apply to aiding and abetting liability.

Ultimately, the jury instruction on withdrawal read as follows:

> Mr. Hoskins has raised the defense that he withdrew from the conspiracy charged in this Count One before September 22, 2005, and that therefore the statute of limitations ran out before the government obtained an indictment charging him with that conspiracy and this prosecution is time-barred. The statute of limitations is a law that puts a limit on how much time the government has to obtain an indictment. . . . The defendant has the burden of proving to you that he in fact withdrew from the conspiracy and that he did so before September 22, 2005.

> Once a person joins a conspiracy, that person remains a member until he withdraws from it. Any withdrawal must be complete and it must be done in good faith. A person can withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his participation in and efforts to promote the conspiracy. In other words, the defendant must have demonstrated some type of positive action that disavowed or defeated the purpose of the conspiracy. Proof that the defendant merely ceased conspiratorial activity is not enough.

> Where a defendant by his conspiratorial actions sets in motion events that are designed to have effect beyond the period of his active participation, the defendant's affirmative act of withdrawal must be aimed at weakening

33

or undermining the foreseeable consequences of his own participation in the conspiracy.

Resignation from employment does not by itself necessarily constitute withdrawal unless you find the defendant acted to disavow or defeat the purpose of the conspiracy.

For example, a defendant may withdraw from a conspiracy by giving a timely warning about the conspiracy to proper law enforcement officials or wholly depriving his prior efforts of effectiveness in the commission of the crime or making appropriate efforts to prevent the commission of a crime or by doing acts that are inconsistent with the objects of the conspiracy and making reasonable efforts to communicate those acts to his coconspirators.

The defendant has the burden of proving that he withdrew from the conspiracy by a preponderance of the evidence. . . . In determining whether the defendant withdrew from the conspiracy, you may consider the relevant testimony of all of the witnesses regardless of who called them, and all the relevant exhibits received in evidence, regardless of who produced them. . . . However, it is important to remember that the fact that the defendant has raised this defense does not relieve the government of its burden of proving each and every element of the crime of conspiracy.

. . . If you find Mr. Hoskins has proven by a preponderance of the evidence that he withdrew from the charged conspiracy before September 22, 2005, then you must acquit him of the charge in Count One. But even if you find that Mr. Hoskins withdrew from the charged conspiracies,

34

that withdrawal is not a defense to Counts Two through Seven or Counts Nine through Twelve.

App'x at 560-61.

The district court's instructions to the jury on withdrawal from the conspiracy do not constitute reversible error. Our case law, as well as Supreme Court case law, has explained that conspirators must engage in an affirmative act to withdraw from a conspiracy. Indeed, *Smith* even uses the same language the district court did—"disavow or defeat." 568 U.S. at 113. Moreover, Hoskins's proposed instruction—that withdrawal from a business enterprise is sufficient to withdraw from a conspiracy involving the business—is not an accurate statement of the law. In *United States v. Nerlinger*, it was not solely the defendant's resignation that constituted withdrawal, but rather the fact that the defendant also closed an account used to perpetuate fraud. 862 F.2d 967, 974-75 (2d Cir. 1988). Therefore, *Nerlinger* does not suggest that, without additional affirmative action, resignation is sufficient to withdraw.

Neither was it error to instruct the jury that a defendant who sets a conspiracy in motion must undermine the conspiracy to withdraw from it. In *United States v. Borelli*, we explained that a defendant cannot simply walk away

35

from a conspiracy she or he has already set in motion without liability. 336 F.2d 376, 388 n.8 (2d Cir. 1964). Conspiracy to violate the FCPA does not cleanly fit into the *Borelli* rubric because it primarily benefits API, not Hoskins, and after Hoskins left Alstom, he had nothing to gain from the subsequent bribery. This does not mean, however, that his departure from Alstom was the kind of affirmative act required to withdraw from an ongoing and forward-looking conspiracy.

It was also not error for the court to include illustrative examples of withdrawal—namely, informing the authorities or preventing the execution of the crime he set in motion. Those examples were taken nearly verbatim from jury instructions in *United States v. LaMorte*, where we affirmed the conviction. 950 F.2d 80, 84-85 (2d Cir. 1990).

Finally, it was not error to rule that withdrawal does not apply to aiding and abetting liability. Hoskins's reliance on *Rosemond v. United States*, 572 U.S. 65 (2014) is misplaced. In *Rosemond*, the Supreme Court analyzed whether an accomplice can be liable for a Section 924(c) violation if he "knows nothing of a gun until it appears at the scene." *Id.* at 78. Despite using the word "withdraw"

36

throughout *Rosemond*, the Supreme Court actually analyzed the intent element of aiding and abetting liability and to what extent an accomplice may be liable for a crime of which he is not fully aware; it was not suggesting that withdrawal is a defense to all aiding and abetting crimes. *See id.* at 80-81. Indeed, we have previously explained that "withdrawal is not a defense to the substantive crime of aiding and abetting." *United States v. Arocena*, 778 F.2d 943, 948 n.3 (2d Cir. 1985).

**IV.   The District Court's Jury Instructions on Venue Were Proper**

Finally, Hoskins argues that the jury instructions on venue constitute reversible error. In deciding Hoskins's motion on this issue below, the district court found that while both parties presented evidence of their own theory—that the payments were separate transactions or that they were part of a singular scheme—the government presented sufficient evidence for a rational jury to conclude venue existed in Connecticut. *See Hoskins II*, 2020 WL 914302, at *12-13.

"A defendant in a criminal case has the right to be tried in the district where the crime was committed." *United States v. Lange*, 834 F.3d 58, 68 (2d Cir. 2016) (internal quotation marks omitted). Venue "must be determined from the

37

nature of the crime alleged and the location of the act or acts constituting it. Venue may lie in more than one place if the acts constituting the crime and the nature of the crime charged implicate more than one location. Venue is proper in any district in which an offense was begun, continued or completed." *Id.* at 68-69 (citations and internal quotation marks omitted). "The Government bears the burden of proving venue by a preponderance of the evidence. Where the Government has prevailed at trial, we review the sufficiency of the evidence as to venue in the light most favorable to the Government, crediting every inference that could have been drawn in its favor." *Id.* at 69 (citation and internal quotation marks omitted).

The money laundering statute at issue here provides that "a transfer of funds from 1 [*sic*] place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts . . . any portion of the transaction may be charged in any district in which the transaction takes place." 18 U.S.C. § 1956(i)(3). It further defines the term "conducts" as "initiating, concluding, or participating in initiating, or concluding a transaction." *Id.* § 1956(c)(2). We have explained that "a multi-step plan to transfer money from one

38

location to another should be viewed as a single 'transfer' under § 1956(a)(2)."

*United States v. Dinero Express, Inc.*, 313 F.3d 803, 806 (2d Cir. 2002).

Here, the district court provided the following jury instruction regarding venue:

> [T]he government must prove that the monetary transaction charged in that count was conducted at least in part in the District of Connecticut. The term "conducts" includes initiating, concluding or participating in initiating or concluding a transaction. If you find that a transfer occurred in multiple stages and you find that each stage was an integral part of a single plan to transfer funds, then you should consider any such transfers to be one single transaction for purposes of determining whether the government has proved the venue requirement.

App'x at 567-69. Hoskins, instead, wanted the court to instruct the jury that if "the movement of funds was in fact two or more separate transactions, then you may not find that venue is proper in the District of Connecticut." Hoskins's Br. at 95 n.19.

The district court's instruction was not in error, as our case law explicitly states that a "multi-step plan to transfer money from one location to another should be viewed as a single transfer under § 1956(a)(2)." *Dinero Express*, 313 F.3d at 806 (internal quotation marks omitted). In *United States v. Harris*, we declined

39

to credit the defendant's argument that two transfers—one from New York to Connecticut and one from Connecticut to Switzerland—should be regarded as "two separate events." 79 F.3d 223, 231 (2d Cir. 1996).

Therefore, it was correct for the court to instruct the jury that two transfers that are "each . . . an integral part of a single plan to transfer funds" can be considered part of a single transaction. *Id.* Given the standard of proof—preponderance of the evidence—the government has also demonstrated with evidence shown at trial that, granting every inference in its favor, venue exists in Connecticut. An API employee in the finance department testified that he authorized payments originating in Connecticut that were ultimately to be used for bribes.

Hoskins also argues that the government did not present evidence that anyone in Connecticut knew how or when the intermediary would transfer the funds to Indonesia. However, even if Hoskins's co-conspirators did not fully know the details of the intermediary's payments to Moeis, evidence at trial demonstrated that they did know the purpose and expectation of the transfers to Sharafi were that they would be used as bribes to secure the Tarahan Project for

API. Although the evidence can be interpreted both ways, a rational juror could have concluded, based on a preponderance of the evidence, that venue existed in Connecticut.

**CONCLUSION**

For the foregoing reasons, we affirm the district court's order granting Hoskins's motion for judgment of acquittal because he was not an agent of API within the meaning of the FCPA. We further affirm the district court's order denying Hoskins's motion to dismiss the indictment on Speedy Trial Act and Speedy Trial Clause grounds, as well as the district court's denial of Hoskins's motion for a judgment of acquittal based on erroneous jury instructions.

LOHIER, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority that the District Court's speedy trial analysis and jury instructions were correct. But those are subsidiary issues. The central question in this case is whether Lawrence Hoskins, a foreign executive of the multinational corporation Alstom S.A., can be held accountable under the Foreign Corrupt Practices Act (FCPA) for his role in helping Alstom Power Inc. ("API"), a Connecticut-based affiliate, execute a criminal foreign bribery scheme. As the majority acknowledges, the answer to that question turns on whether he acted as an agent of API in that scheme.

In answering that question in the negative and affirming the District Court's partial grant of Hoskins's Rule 29 motion for acquittal despite the jury's guilty verdict, the majority agrees that Hoskins played a central role in bribing Indonesian officials to help API secure a large power-plant project there (the "Tarahan project"), that he repeatedly followed API's instructions relating to the bribery scheme, that he sought API's approval at each critical step, and that API controlled virtually every aspect of the scheme. See Majority Op. at 20–23.

Bearing in mind the standards of review for post-trial motions, which are highly deferential to the jury's verdict, I would instead reverse the District Court's acquittal as well as its conditional grant of Hoskins's Rule 33 motion for a

1

new trial.  See United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008) (Rule 29); United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (though the district court has "broader discretion" under Rule 33 than Rule 29, "it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances" (quotation marks omitted)).  Let me explain why.

To start, I agree with my colleagues that Hoskins's liability under the FCPA turns on whether the Government proved that he acted as an "agent of [a] domestic concern"[1] in furtherance of the scheme to win the Tarahan project.  See 15 U.S.C. § 78dd-2(a).  Here, API is the "domestic concern."  The FCPA unfortunately leaves the term "agent" undefined, but the parties agree that the common-law definition of agency applies, and the District Court instructed the jury using that definition.  Although the wisdom of the Government's concession on this point is debatable, we are stuck with the common-law definition for purposes of resolving this appeal.  But even under that definition, the jury's verdict was sound.

---

[1] As directly relevant here, the FCPA defines the term "domestic concern" to include "(B) any corporation, . . . which has its principal place of business in the United States, or which is organized under the laws of a State of the United States."  15 U.S.C. § 78dd–2(h)(1)(B).

2

Agency is a legal concept that, as the District Court instructed the jury, requires "one, a manifestation by the principal that the agent will act for it; two, acceptance by the agent of the undertaking; and, three, an understanding between the agent and the principal that the principal will be in control of the undertaking," meaning "the acts or services which the agent performs on behalf of the principal." App'x 559; accord United States v. Wells Fargo & Co., 943 F.3d 588, 598 (2d Cir. 2019); Cleveland v. Caplaw Enters., 448 F.3d 518, 522 (2d Cir. 2006). Although the existence of an agency relationship is "highly factual" and "can turn on a number of factors," Cleveland, 448 F.3d at 522, an "essential element of agency is the principal's right to control the agent's actions," Hollingsworth v. Perry, 570 U.S. 693, 713 (2013) (quoting Restatement (Third) of Agency § 1.01 cmt. f (Am. L. Inst. 2005)). My colleagues focus on whether API had a right to terminate Hoskins as a general matter. But ultimately, in my view, and as the District Court itself recognized, this appeal boils down to whether the Government presented sufficient evidence of API's control over Hoskins's actions "in connection with the specific events related to the Tarahan Project." App'x 559 (jury instructions).

3

There is no doubt that the corporate organizational charts introduced at trial paint a picture that favors the majority's account. The charts show that Alstom was divided into "Sectors" and "Functions." See App'x 1024, 1040. The "Sectors" were business units operated through Alstom's subsidiaries, like API. See App'x 266, 324. The "Functions," meanwhile, included corporate divisions such as the General Counsel's office and Alstom's International Network that provided support, coordination, and oversight across multiple Sectors and regions. See App'x 960, 1024. As International Network's Area Senior Vice President for Asia Pacific and Northern and Eastern Europe, Hoskins helped identify, negotiate with, and approve third-party consultants in those regions.

At trial, there was no dispute that the corporate organizational charts and other evidence showed that Hoskins formally reported only to International Network, and not to API or any other Alstom Sector. That evidence reflects that the reporting lines of a "Function" like International Network would not have converged with the reporting line of a business unit such as API until the level of the Deputy CEO of the parent corporation in France. See, e.g., App'x 1040.

But Alstom's organizational charts mask the reality of the relationship between Hoskins and API on the ground. The jury heard testimony, which it

4

was entitled to credit, that the head of sales and marketing for Alstom's global boiler business and employee of API, appellant Frederic Pierucci, in fact "called the shots as far as the strategy on the [Tarahan] project and as far as a consultant or agent," App'x 470; see also App'x 267, 272, 356–57, 463, 465. According to one trial witness, Hoskins "didn't call the shots or the strategy on Tarahan. Fred Pierucci . . . was in control. So in that sense, Mr. Hoskins would have been reporting to [Pierucci] on the Tarahan Project." App'x 482; see also Majority Op. 22-23 ("[I]t was ultimately API that did the negotiating and contracting [of consultants].").

As the majority acknowledges, "[t]he record demonstrates that Hoskins's actions in furtherance of securing consultants for the Tarahan Project were all subject to the decision-making of Pierucci and other executives of API." Majority Op. 20. Yet the majority insists that there was insufficient "evidence to allow the jury to find an agency relationship" because "Hoskins and API's relationship lack[ed] key elements of agency, such as any indication that Hoskins had any authority to act on API's behalf, and whether API could revoke any authority it purportedly gave to Hoskins, or even do anything to control Hoskins's actions." Id. at 21 (quotation marks omitted).

5

I respectfully disagree. To prove the existence of an agency relationship under the circumstances of this case, the Government was not required to show that API could cut Hoskins out of the scheme entirely. It had to prove only that API could terminate his involvement — and thus revoke his authority — at least in part. In my view, the Government made that more limited showing.

On top of the evidence of Hoskins's broader role in hiring consultants on API's behalf, the jury had before it specific evidence of Hoskins's targeted agency on behalf of — and with the authority granted to him by — API. And the Government elicited evidence of API's power to terminate some of his agency to transact on its behalf on the Tarahan deal.

For example, Hoskins was instructed to convey to API's first consultant, Pirooz Sharafi, that API had decided to reduce Sharafi's commission. Thereafter, Hoskins told Azmin Aulia, Sharafi's replacement, that API would be hiring him at a two percent commission on his consulting agreement, and he then confirmed Aulia's commitment to that commission. Those actions fall within what the common law contemplates as indicators of an agency relationship. See Restatement (Third) of Agency § 1.01 cmt. c (noting that agents "often have authority to negotiate or to transmit or receive information on" behalf of their

principals). A jury could reasonably infer that API had significantly limited Hoskins's agency to set the terms for hiring corrupt consultants, even if it could not altogether end his role in finding and retaining them.

Yet another example: the jury learned from David Rothschild, an API salesperson who worked on the Tarahan project and testified as a cooperating witness, that API had "ultimate decisionmaking authority" over "which consultant to hire," "how much to pay the consultant," and "the terms of payment." See App'x 317. Hoskins had no authority to hire consultants absent API's direction and was powerless to bind the affiliate without its express approval. See App'x 317, 469. The consultancy agreements themselves confirm API's full and final authority to hire consultants, regardless of what Hoskins thought or did. They were executed by API on its own behalf — not by Hoskins or Alstom S.A., the parent company — and used to funnel payments to consultants while giving API "the right to establish the prices and conditions of its tender and the Contract." App'x 821; see also App'x 272, 434, 819, 828, 837.

The Government also introduced evidence that API could terminate the agency relationship with Hoskins by revoking his authority to work with consultants — as it did, for instance, when it revoked his authority to work with

7

a consultant named Harsono, who had previously been selected.[2] See App'x 862–64, 271–73, 317; Restatement § 1.01 cmt. f. (a principal terminates the agency relationship "by revoking the agent's authority").

Finally, the jury could infer API's authority to initiate and terminate at least a part of its relationship with Hoskins from the nature of his role with respect to API and other Alstom businesses. The majority counters that there were no "facts" introduced at trial showing that API could terminate its relationship with Hoskins or that it otherwise exerted control over Hoskins. Majority Op. at 23–24. Respectfully, the jury clearly had before it the fact that Hoskins was obliged to "serv[e] all Sectors" – including API – "based on [its] needs and requests," provide "[s]ales support as requested by the Sectors," and provide "[s]upport in contract execution (customer contacts) if requested." App'x 996–97, 999 (emphasis added); see also App'x 287 ("[Hoskins] provided support to Fred Pierucci on an as-needed basis, as he would with all business units."). It was thus up to sectors such as API, not International Network, to

---

[2] Allegedly as part of the bribery scheme, one of Hoskins's subordinates requested API's "go-ahead" to hire Harsono. See App'x 862. Indeed, Pierucci asked Hoskins for a status update, and Hoskins subsequently briefed him. App'x 860. But API — not the parent company or International Network — eventually rejected Hoskins's plan to hire Harsono. See App'x 273.

initiate the agency relationship with Hoskins. See App'x 949 ("The need for a [third-party] sales supporting Agent can be raised by any Sector organisation."). And in this case, Hoskins's actions relating to the Tarahan project were initiated by and under the control of API, the requesting "Sector." In sum, the jury could reasonably have concluded from the fact that Hoskins served API's needs only "as requested" by API that API had the power to revoke its request and terminate Hoskins's authority to hire, negotiate with, or work with a consultant on its behalf, despite Alstom's formal organizational structure.

To be sure, the evidence of API's authority to cut ties with Hoskins — the central evidence of the agency relationship that the majority finds lacking — was slim. But slim is not the same thing as insufficient. There was sufficient evidence to reject Hoskins's motion to vacate under Rule 29 and let the jury's verdict stand under Rule 33. Where, as here, a properly instructed jury has found that API controlled Hoskins at least in part — and therefore that an agency relationship existed — the Government must be given every benefit of the doubt as to the accuracy of the jury's answer. See Eppolito, 543 F.3d at 45 (in reviewing a Rule 29 judgment of acquittal, we must "credit[] every inference that the jury might

have drawn in favor of the government" (quotation marks omitted)).  There is no "manifest injustice" in that answer.  <u>Ferguson</u>, 246 F.3d at 134.

To the contrary, if Hoskins cannot be held accountable under an agency theory of liability, then he will evade accountability under the FCPA altogether, even though as part of API's bid to secure a foreign contract, he played a critical role on behalf of the company in hiring consultants to bribe local Indonesian officials, offering his advice on which consultants to hire and then locking down contract and payment terms.  Such a result also creates an incentive that Congress could not have wanted:  U.S. companies will be motivated to organize themselves to avoid exercising control over the employees of foreign affiliated companies who engage in bribery overseas.

Finally, a broader point.  The FCPA was amended in 1998 to bring the United States into compliance with the world's most influential treaty to combat transnational bribery, the Organization for Economic Cooperation and Development (OECD) Convention on Combatting Bribery of Foreign Public Officials in International Business Transactions, known as the "OECD Convention."  See S. Rep. No. 105-2177 (1998) (expressing Congress's intention that the 1998 amendments to the FCPA "conform it to the requirements of and to

implement the OECD Convention").  The convention was intended to target more bad actors, not fewer.  See Kevin E. Davis, Between Impunity and Imperialism:  The Regulation of Transnational Bribery, at 5–9 (2019) (describing the "OECD paradigm" that "anything foreign legal institutions can do to help combat transnational bribery is likely to be worthwhile," including "prohibit[ing] a broader range of conduct, target[ing] more actors, impos[ing] more severe sanctions, and get[ting] more and more agencies involved in enforcement"); see also OECD Conv. Preamble ("[A]ll countries share a responsibility to combat bribery in international business transactions.").  The OECD Convention calls on signatories to "take such measures as may be necessary to establish that it is a criminal offence under its law for any person intentionally to" bribe a foreign public official, whether "directly or through intermediaries," OECD Conv. Art. 1.1 (emphasis added), and to assert jurisdiction "when the offence is committed in whole or in part in its territory," OECD Conv. Art. 4.1.

With that in mind, "[i]t makes little sense to permit the prosecution of foreign affiliates of United States entities who are minor cogs in the crime," United States v. Hoskins, 902 F.3d 69, 104 (2d Cir. 2018) [hereinafter Hoskins I] (Lynch, L, concurring), while immunizing those who, acting as an agent of the

11

domestic company's foreign parent, actively participate in the company's commission of FCPA violations. Neither Hoskins nor the majority has pointed to any specific language or history suggesting that Congress intended to cover only third-party intermediaries, or to exclude employees like Hoskins whose responsibility was, at least in part, to help a domestic concern locate and hire bribe-paying intermediaries.

More worrying still, the OECD is currently considering whether this Court's initial decision in Hoskins I limiting liability under the FCPA has placed the United States in violation of the Convention. See OECD, Implementing the OECD Anti-Bribery Convention: United States Phase 4 Report (2020), at 36–39, available at https://www.oecd.org/daf/anti-bribery/United-States-Phase-4-Report-ENG.pdf (last visited on Aug. 10, 2022) ("To the extent that recent U.S. case law developments create a divergence between how U.S. courts apply conspiracy law to those who conspire to bribe domestic and foreign officials, the lead examiners consider that this would violate the Convention."). Today's decision cannot possibly help in that regard. Under Hoskins I, Hoskins cannot be found guilty of conspiracy to violate the FCPA, nor can he be held liable for aiding and abetting the commission of bribery. See Hoskins I, 902 F.3d at 83–84.

Hoskins I left open the possibility that Hoskins could be held liable as an "agent of a domestic concern."  See id. at 72.  But now the majority blocks that path as well.  This result is "unlikely to have been specifically anticipated or intended" by the drafters of the FCPA, id. at 104 (Lynch, J., concurring), let alone the OECD Convention.  "If anything," as the Government observes, "a restrictive definition of agent" under the FCPA "could put the U.S. in violation of the OECD Convention to the extent that it prevents prosecution of those responsible for bribery that occurred in part in this country."  Gov't Reply Br. at 46 n.2.  Congress, or the Supreme Court, will eventually have to clarify the statute's scope and correct our course.

For these reasons I respectfully concur in part and dissent in part.